IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY E. CLEMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:11-CV-264-WKW |
| | ) | [WO] |
| RED STAR YEAST CO., LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Bobby E. Clemmons brings this breach of contract action against his former employer of eight years, Red Star Yeast Co., LLC. He contends that Red Star breached a contract with him by refusing to pay him $412,612.29 in severance benefits. Before the court is Red Star's Motion for Summary Judgment, which is accompanied by a brief and an evidentiary submission. (Docs. # 35, 36.) Red Star argues that it is entitled to summary judgment because no valid contract for severance pay existed between it and Mr. Clemmons. Mr. Clemmons filed a brief and evidence in opposition to the motion (Docs. # 37, 38), to which Red Star replied (Doc. # 40). After careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that Red Star's Motion for Summary Judgment is due to be granted.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction over this removed action is exercised pursuant to 28 U.S.C. §§ 1332(a) and 1441(a).  The parties do not contest personal jurisdiction or venue, and there are allegations sufficient to support both.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (quoting former Fed. R. Civ. P. 56(c)).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists.  Fed. R. Civ. P. 56(e); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).  "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the

3

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his or her case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323.

On summary judgment, the facts must be viewed in the light most favorable to the non-movant. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Hence, "'facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'" *Id.* (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).

## III. BACKGROUND

By the summer of 2010, Red Star's business operations at its Headland, Alabama plant were struggling financially. On July 29, 2010, Red Star held a meeting with the thirty-three plant employees, including Mr. Clemmons, and announced that, because the plant's "business was down," it was implementing a plan

4

to reduce its workforce by approximately 25%.  (Pl.'s Dep. 102–05.)  The reduction-in-force plan would begin with temporary layoffs of eight employees.

The same day, representatives of Red Star met with the eight employees whom it had selected for layoffs.  Mr. Clemmons, who had worked as a farm manager for Red Star for approximately eight years, was one of those eight employees.  At the meeting, Mr. Clemmons received a packet containing two letters, each dated July 29, 2010.  The first letter explained that Red Star's "decision to reduce the workforce" was "driven by market conditions and plant economics," not by employee performance.  (July 29 Layoff Letter 1.)  The letter summarized the benefits Mr. Clemmons would receive during the five-month layoff period, effective August 3, 2010, through December 31, 2010.  Those benefits included pay at 80% of his salary. The letter also indicated a possibility that the layoff would be temporary and, if so, that Mr. Clemmons would "receive a recall notice." (July 29 Layoff Letter 1.) If Red Star was unable to recall him, however, it would terminate his employment at the end of the layoff period, effective December 31, 2010, and would pay him "in accordance with its applicable severance policy."  (July 29 Layoff Letter 1.)  The letter concluded:

> Please note that in the event that there is a recall and we cannot reach you within three (3) working days (first, a telephone call and then, if no response, a registered letter), we will proceed to the next person and

5

consider your failure to respond a resignation from Red Star Yeast Company.

(July 29 Layoff Letter 1.)

The second letter outlined the severance pay Mr. Clemmons would receive in the event that he was not recalled and his employment was terminated, effective December 31, 2010.[1]  At the heart of this case is whether Red Star meant what it wrote when it outlined the method for calculating severance pay.  This is what it wrote:

> In the event you are not recalled from Layoff, Red Star Yeast Company, LLC, will provide the following Severance Benefits following your termination with the Company.
>
> **Severance Pay**
> *One week pay for every week of service*, based on 40 hours of work week.  Payment will be in one lump sum, less customary withholdings and deductions.

(July 29 Severance Pay Letter 1 (emphasis added).)  Red Star contends that this severance pay provision contains what is tantamount to a $400,000 typographical error.[2]  It argues that what it meant to write was "one week of pay for every *year* of

---

[1] Both letters were signed by Laura M. Collins, Red Star's corporate human resource manager.  All eight employees received the same packet of letters.

[2] As discussed below, Red Star did not discover this typographical error until the employee terminations went into effect.

6

service." (Collins's Dep. 40–42, 44; Roach's Aff. ¶ 6.) Nonetheless, this provision was in the letter that Mr. Clemmons and the other seven laid-off employees received.

Needless to say, Mr. Clemmons deemed the severance benefits very charitable and communicated his gratitude to Red Star. After meeting with his attorney, Mr. Clemmons penned a letter to Ms. Collins, dated August 9, 2010, writing: "It was a pleasure meeting with you on Thursday, July 29, 2010 at the plant and you reviewing with me the severance benefits and termination benefits that the company has so generously provided as set out in your letter of July 29, 2010." (Aug. 9 Letter 1; Pl.'s Dep. 161.) He further asserted that the benefits would be "greatly relied upon" by him and by his family. (Aug. 9 Letter 1.) Finally, Mr. Clemmons expressed in his letter that he hoped the economic conditions at the plant would change so that Red Star would not have to follow through with the planned terminations.

The economic situation at the Headland plant did not improve, and Red Star terminated Mr. Clemmons's employment, along with the seven other laid-off employees, effective December 31, 2010. In a letter, dated December 28, 2010, Red Star notified Mr. Clemmons of his reduction-in-force termination and informed him that he would "receive eight (8) weeks salary in one lump sum payment of $7,143.54." (Dec. 28, 2010 Letter (Ex. 5 to Doc. # 38).) That severance pay was the equivalent of one week of pay for every *year* of service.

Red Star did not become aware of the typographical error in the July 29, 2010 letter until after it had mailed the termination notices, dated December 28, 2010. After receiving the December 28 termination letter, one of the other laid-off employees contacted Ms. Collins to inquire about the discrepancy in the severance pay provisions. (Collins's Dep. 40.) At that point, Ms. Collins reread the July 29 Severance Pay Letter and realized that she "had made a huge mistake." (Collins's Dep. 40.) Following this employee's telephone call, Ms. Collins prepared and mailed letters to all of the laid-off employees, with the exception of Mr. Clemmons, explaining the mistake and informing them that the correct severance payment was stated in the December 28, 2010 letter.[3] (Letters (Ex. 7 to Doc. # 36).)

Claiming that he was entitled to receive $412,612.29 in severance pay, rather than the comparatively paltry amount of $7,143.54, Mr. Clemmons filed this action against Red Star in the Circuit Court of Henry County, Alabama, on March 22, 2011. The Complaint contains a single count for breach of contract for failure of Red Star to pay Mr. Clemmons $412,612.29 in severance benefits. Red Star timely removed this action based upon diversity jurisdiction. *See* §§ 1332(a) and 1441(a). It filed its

---

[3] According to Red Star, this letter was not sent to Mr. Clemmons, but the reason why is not in the record.

8

answer to Mr. Clemmons's complaint denying the allegations and, after discovery, filed the present motion for summary judgment.

## IV.  DISCUSSION

The sole issue on summary judgment is whether Mr. Clemmons and Red Star entered into a valid contract for severance pay calculated based upon one week's pay for every week of service.  Because Red Star has shown that there is no genuine dispute as to any material fact on this issue, it is entitled to summary judgment on the breach of contract claim.

To establish a breach of contract claim under Alabama law, a plaintiff must show four elements:  (1) a valid contract; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) damages.  *See Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009).  The elements of a valid contract are "'an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract.'"  *Ex parte Grant*, 711 So. 2d 464, 465 (Ala. 1997) (quoting *Strength v. Ala. Dep't of Fin., Div. of Risk Mgmt.*, 622 So. 2d 1283, 1289 (Ala. 1993)).

Red Star contends that Mr. Clemmons cannot demonstrate any of the four elements for establishing a valid contract for severance pay.  For the reasons to follow, the breach of contract claim fails because the material evidence is undisputed

that Red Star received no consideration from Mr. Clemmons for its promise to pay severance benefits and because mutual assent to an essential term is missing. Because these elements are dispositive, Red Star's other arguments need not be reached.

## A.   <u>Consideration</u>

"Consideration must be present when the contract is made. The requirement of consideration means that a gratuitous promise is not enforceable." *Fant v. Champion Aviation, Inc.*, 689 So. 2d 32, 37 (Ala. 1997); *see also Smith v. Wachovia Bank, N.A.*, 33 So. 3d 1191, 1197 (Ala. 2009) ("[T]he formation of a contract requires a bargain in which there is . . . a consideration." (quoting Restatement (Second) of Contracts § 17(1)). Consideration consists of "an act, a forbearance, a detriment, or a destruction of a legal right, or a return promise, bargained for and given in exchange for the promise." *Shaffer*, 29 So. 3d at 881. As explained in *Ex parte Grant*,

> [a] test of good consideration for a contract is whether the promisee at the instance of the promisor has done, forborne or undertaken to do anything real, or whether he has suffered any detriment, or whether in return for the promise he has done something he was not bound to do, or has promised to do some act or to abstain from doing something.

711 So. 2d at 465 (citation and internal quotation marks omitted).

With these principles in mind, the court turns to the basis of Mr. Clemmons's claim for $412,612.29 in severance pay. In the July 29 Layoff Letter, Red Star

promised to pay Mr. Clemmons severance benefits in the event that it was unable to recall him after the five-month layoff period.[4]  Red Star argues that its promise to pay severance benefits to Mr. Clemmons, whether calculated at $412,612.29 or $7,143.54, was gratuitous and not supported by consideration.[5]  Red Star contends that the promise was gratuitous because it did not demand or seek anything from Mr. Clemmons in exchange for the payment of severance benefits.  For example, Red Star points out that it did not require Mr. Clemmons to relinquish unemployment compensation, to release any claims against it, to forego outside employment opportunities during the layoff period, or even to continue his service of employment with Red Star.

Taking a contrary stance to Red Star, Mr. Clemmons contends that the consideration for Red Star's promise of severance benefits was that he "remain[ed] available for employment within three working days notice," as required by Red Star. (Pl.'s Summ. J. Resp. 1, 4–5.)  Mr. Clemmons's argument is, however, factually incorrect and legally unsound.

---

[4] Mr. Clemmons also received benefits during the layoff period, including payment at 80% of his salary.  He does not allege any impropriety in the calculation or payment of the specified layoff benefits.

[5] It should be noted that Red Star does not seek to withhold severance pay from Mr. Clemmons altogether, but rather only disputes the method for computing severance pay.

First, Mr. Clemmons's factual contention in his brief that, during the five-month layoff period, he was required to remain on call to return to work within three business days of a recall as a condition for receiving severance pay is contradicted by the evidence. The July 29 Layoff Letter upon which Mr. Clemmons relies provides only that Red Star had to be able to "reach" Mr. Clemmons by telephone or registered letter within three working days in the event of a recall, not that he had to report to work within three working days of a recall.[6] (*See* July 29 Layoff Letter 1 (stating that, "in the event that there is a recall and we cannot *reach* you within three (3) working days (first, a telephone call and then, if no response, a registered letter), we will proceed to the next person and consider your failure to respond a resignation from Red Star Yeast Company." (emphasis added)).) Hence, Mr. Clemmons's factual position is indefensible based upon the July 29 Layoff Letter.

Mr. Clemmons points to no evidence to suggest that the promise of severance benefits was impliedly or expressly based upon Mr. Clemmons's promise to be at Red Star's beck and call during the five-month layoff period or, as stated conversely by him, to "not seek[ ] other employment." (Pl.'s Resp. to Summ. J. 6.) Red Star presents uncontradicted evidence that Mr. Clemmons's retention of another job

---

[6] It should be noted that in his Statement of Facts, Mr. Clemmons recognized this distinction. (*See* Pl.'s Summ. J. Resp. 2 ("In the event there was a recall, Clemmons had to be in contact with Red Star within three working days.").)

during the layoff period would not have disqualified him from receiving severance pay in the event that Red Star did not recall him at the end of the layoff period. That evidence includes the July 29 letters, which contain no restriction on a laid-off employee's obtaining outside employment, and an affidavit from Dominique Ciboulet, Red Star's director of operations. Mr. Ciboulet confirms that "laid-off employees were free to seek and accept other employment during the layoff period, and doing so would not affect their ability to receive severance pay from Red Star if and when the layoff became permanent." (Ciboulet's Aff. ¶ 6.) Moreover, the evidence shows that Mr. Clemmons did, in fact, work another job as a substitute bus driver during the layoff period, and there is no evidence that this job affected his ability to receive severance benefits. (Pl.'s Dep. 83.)

Second, Mr. Clemmons relies upon the holdings of two Alabama Supreme Court cases, but those holdings do not extend to the facts of this case. In *Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725 (Ala. 1987), the Alabama Supreme Court examined whether an employee handbook could "constitute an offer to create a binding unilateral contract." *Id.* at 735. It set forth a three-part analysis:

> First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second, the offer must have been communicated to the employee by issuance of the handbook, or otherwise. Third, the employee must have accepted the offer by

13

> retaining employment after he has become generally aware of the offer.
> His actual performance supplies the necessary consideration.

*Id.*  The court found there was a contract between the employer and employee based upon the employee handbook because the employee accepted the offer in the handbook and provided consideration for the contract by continuing to work after he became aware of the offer in the handbook.  *See id.*

In *Evans v. National Microsystems, Inc.*, 576 So. 2d 207 (Ala. 1991), also cited by Mr. Clemmons, the court put into practice the holding of *Hoffman-La Roche*. There, the employer reduced its workforce in response to difficult financial times and notified its employees of this decision in a memorandum.  *See id.* at 207–08. The memorandum provided that employees who were dismissed would receive severance pay and be "eligible for unemployment benefits." *Id.* at 208.  The plaintiff, whose job was being eliminated, was assured by management that, if he tendered a letter of resignation, he would receive the promised severance pay, as well as his employer's consent to seek employment with a competitor company.  The plaintiff tendered his resignation and was hired by the competitor company, but was denied severance pay on the ground that he "immediately obtained other employment." *Id.*

The *Evans* court recognized that the facts before it were not on all fours with those in *Hoffman-La Roche* because under *Hoffman-La Roche*, "the employee showed

his acceptance of the offer made to him by continuing on the job," and his continued employment was sufficient consideration. *See id.* at 209–10. It held, however, that under the "fact situation" with which it was confronted, the plaintiff's "performance – the tendering of his resignation – eliminated his right to any unemployment benefits he might collect and was sufficient consideration for [the employer's] promise of severance pay." *Id.* at 210. The court also found that the employer "derived a pecuniary benefit from [the plaintiff's] agreement to give up his entitlement to unemployment compensation because under Alabama law the payment of unemployment benefits increases an employer's contribution rate." *Id.* Given its holding, the court reversed the grant of summary judgment in favor of the employer on the plaintiff's claim that his employer's failure to pay him severance pay after he presented a letter of resignation, as requested, breached a contract. *Id.* at 209–10.

Mr. Clemmons does not contend that the facts of this case are identical to those in either *Hoffman-La Roche* or *Evans*. Indeed, they are not. Unlike in *Evans*, there is no evidence that Red Star sought Mr. Clemmons's resignation or required him to relinquish his right to unemployment benefits in exchange for paying him severance benefits. Resignation was not an option for Mr. Clemmons; rather, he was laid off and then terminated, both involuntarily. Also, notably, it is undisputed that Mr. Clemmons applied for and received unemployment benefits immediately following

his termination by Red Star.  (Pl.'s Dep. 86.)  Mr. Clemmons also does not contend

that, as in *Hoffman-La Roche*, he continued to work for Red Star based upon the offer

of severance pay.  To the contrary, the evidence reveals that he was laid off without

any expectation of further work performance or employment at Red Star.  Rather, Mr.

Clemmons's sole argument for the extension of *Hoffman-La Roche* and *Evans* to the

facts of this case is that he accepted the offer of severance benefits and supplied the

necessary consideration by "not seeking other employment so he could be available

on three days notice."  (Pl.'s Summ. J. Resp. 6.)  That argument cannot stand,

however, because, as explained above, the factual foundation upon which it rests is

faulty.

Under the fact situation here, the evidence establishes, without genuine dispute,

that to receive severance payments from Red Star, Mr. Clemmons merely had to

remain on layoff status through December 31, 2010, by not being recalled during the

layoff period.  In other words, as long as a recall did not occur during the layoff

period, Mr. Clemmons's employment would be terminated on December 31, 2010,

and, as a result of that termination, he would receive severance benefits.  In sum, even

if it is assumed that Red Star promised Mr. Clemmons severance pay in the amount

of  $412,612.29,  Mr. Clemmons  has  not  identified  a  legally  cognizable  act,

forbearance or performance on his part in exchange for Red Star's promise.  Because

16

Mr. Clemmons presents no evidence raising a genuine issue of material fact that he provided consideration for Red Star's promise to provide severance pay, there is no valid contract for severance pay between Red Star and Mr. Clemmons.

## B.   <u>Mutual Assent</u>

Mutual assent to the essential terms of the contract is necessary to the making of a contract.  Stated differently, there must be a meeting of the minds.  *See Mobile Attic, Inc. v. Kiddin' Around of Ala., Inc.*, 72 So. 3d 37, 44 (Ala. Civ. App. 2011) (citing *Lilley v. Gonzales*, 417 So. 2d 161, 163 (Ala. 1982)).

Red Star presents evidence that it made a colossal mistake in its Severance Pay Letter when it wrote that Mr. Clemmons would receive one week's pay for "every week of service."  Red Star contends that its intent was that Mr. Clemmons would be paid one week's pay for "every year of service."  Based upon this unilateral mistake, Red Star argues that there was no meeting of the minds or mutual assent sufficient to establish that a contract was formed between it and Mr. Clemmons to award severance pay in the amount of $412,612.29.  To prove its true intent, Red Star admits

that it must rely on extrinsic evidence.[7]  Mr. Clemmons argues that the terms of the Severance Pay Letter calculating the severance pay award are unambiguous, that those terms must furnish Red Star's intent, and that Red Star cannot prove a contrary intent based upon extrinsic evidence.

The precise issue is whether evidence of Red Star's mistake on its part as to the method for calculating severance pay is admissible to prove that there was no contract because of the lack of mutual assent necessary to create one.  The meaning of the parol evidence is well defined in Alabama law:

> "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."

---

[7] Namely, Red Star submits evidence that the statement in the July 29, 2010 letter that severance pay would be calculated based upon "one week of pay for every *week* of service" was a scrivener's error.  For example, Michael J. Roach, Red Star's controller, attests that, in preparation for the layoffs and possible reduction in workforce, he reviewed Red Star's budgets and forecasts, including a spreadsheet indicating the financial outlay for the layoff period and severance pay.  Attached to Mr. Roach's affidavit is this spreadsheet, dated August 2, 2010, which calculates the eight employees' severance pay based upon one week of pay for every year of service.  He further attests that calculating severance benefits based upon one week of pay for every year of service was consistent with the non-union severance paid in a 2005 shutdown of Red Star's Baltimore and Milwaukee plants.  Mr. Roach contends that Red Star "always intended the employees' severance to be one week of pay for every year of service" and "never contemplated paying the employees affected by the layoff and RIF severance equal to one week of pay for every week of service."  (Roach's Aff. ¶¶ 6-7.)

*Hibbett Sporting Goods, Inc. v. Biernbaum*, 375 So. 2d 431, 434 (Ala. 1979) (quoting 3A. Corbin, Contracts, § 573, at 357).  The court also explained that the oft-stated simplistic recitation that "parol evidence is not admissible to vary or contradict the terms of a written contract" gives short shrift to the rule.  *Id.* at 434.  "Where there exists doubt that the written agreement was ever intended to reflect the full agreement of the parties, the courts of this State have not hesitated to admit contradictory parol evidence of their true agreement."  *Id.*  Assent must precede, or at least coexist with, the writing.  The writing is evidence of mutual assent.  It cannot itself supply mutual assent.

In *Hibbett*, the written lease agreement, on its face, was "complete and unambiguous," containing clear terms and a merger clause; however, there was undisputed evidence that the written lease agreement omitted terms pertaining to a previously negotiated oral agreement.  *Id.*  The court reasoned:  "To the extent, then, that the written lease contradicts the actual agreement of the parties, it is simply untrue, and the presence in the writing of a merger clause is immaterial."  *Id.* at 435.  "Paper and ink possess no inherent power to cause statements to be true when they are actually untrue, and a provision in a writing that there exist no previous understandings or agreements not contained therein is merely a statement which

actually may be untrue." *Id.* "The parol evidence rule does not prevent the admission of contradictory evidence to establish the truth." *Id.*

The *Hibbett* court further held that whether the parties have assented to a writing as a complete integration of their agreement is a question of law for the court. The question is ultimately one of intent and must be answered based upon not only the written instrument itself, but also the conduct of the parties and the surrounding circumstances. *See id.* at 435-36. In other words, "[t]he written document alone is insufficient." The court explained:

> Indeed, the very testimony that the parol evidence rule is supposed to exclude is often, if not always, necessary before a court can determine that the parties have agreed upon the writing as a complete and accurate statement of their contract. The evidence that the rule seems to exclude must be heard and weighed before it can be excluded by the rule. 3 A. Corbin, Contracts, s 582 at 450 (1960). See, also, Wigmore, Evidence, s 2430(2). The paradox, however, is only apparent. Parol evidence of the alleged negotiations leading to the written agreement is received by the trial court only on the issue of whether the offered writing was mutually assented to as a complete integration. If, despite the received testimony, the court finds that the writing was mutually assented to as a complete integration, it thereby determines that the negotiations testified to were discharged and nullified by the parties themselves. 3 A. Corbin, Contracts, s 582 at 450, note 80.

*Id.* at 436.

This case is not about, as in *Hibbett*, the consequence of a merger clause in the face of a prior, contradictory oral agreement. However, the principles of *Hibbett* are no less applicable here. The terms of the purported contract are clear. Those terms

plainly delineate that Mr. Clemmons would receive "one week pay for every week of service"; however, the very evidence that Mr. Clemmons urges the court not to consider is the very evidence that demonstrates that there was no meeting of the minds by a magnitude in excess of 57 ($412,612 ÷ 7,143 = 57.8).  Mr. Clemmons's mind was in Paris; Red Star's mind was in Paducah.[8]  The truth is that Red Star had never intended to "offer" Mr. Clemmons severance pay equal to that of what he earned during his entire eight-year employment with Red Star.  It would be no different than a typographical error that severance pay would be paid for 100 years when, but for an extra zero, the offeror intended ten years.  That the "offer" was a typographical mistake is undisputed, and consideration of the evidence of that mistake must be permitted to forestall a manifest injustice and to permit the truth to be told.  On this record, the undisputed evidence shows that there was no meeting of the minds.

## V.  CONCLUSION

Mr. Clemmons fails to present evidence to create a genuine issue of material fact that he provided consideration for Red Star's promise of severance pay or that there was mutual assent to severance pay in the amount of $412,612.29.  Accordingly, Mr. Clemmons's breach of contract claim cannot survive summary judgment.

---

[8] The court is aware that there is a Paris in Kentucky, but that is not the one.

Accordingly, it is ORDERED that Red Star's Motion for Summary Judgment (Doc. # 35) is GRANTED.

A final judgment will be entered separately.

DONE this 2nd day of April, 2012.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE